A01A1980, A01A1981. EDWARDS v. EDWARDS (two cases).
(563 SE2d 888)

BLACKBURN, Chief Judge.

In Case No. A01A1980, Donna Maxwell Edwards appeals a judgment denying her motion to vacate an order of incarceration and con-

---

tempt. She contends that the superior court erred in denying her motion to vacate because she demonstrated her willingness to comply with the terms of the operative order governing child visitation.

In Case No. A01A1981, Donna Maxwell Edwards seeks discretionary review to contest the superior court's refusal to recognize and accord full faith and credit to a judgment entered by the Supreme Court of the Commonwealth of the Bahamas ("SCCB") which awarded her sole custody of her minor child. We granted the application to resolve the ongoing conflict between two existing custody orders, one issued in the Bahamas and the other in Georgia. After review, we reverse the superior court's decision not to recognize the custody order entered in the Bahamas.

These two interrelated, companion appeals are the legacy of a protracted legal battle between Donna Maxwell Edwards (hereinafter "Maxwell") and John Adam Edwards. For more than nine years, Maxwell and Edwards have continued to litigate their respective rights and obligations as to their minor son. The chronology of this litigation and key events began shortly after Maxwell and Edwards married in June 1990 and their only child, Ryan Maxwell Edwards, was born on April 26, 1992. A few months after Ryan's birth, in August 1992, Maxwell filed for divorce. The final judgment and decree awarded Maxwell the sole, permanent legal and physical custody of Ryan and set forth a visitation schedule for Edwards that authorized gradually increasing visits with Ryan. The final judgment was entered on November 10, 1994, in the Superior Court of Fulton County. Nothing in the final judgment purported to preclude Maxwell from moving out of state or to another country.[1] We therefore do not address the appropriateness of any such limitation. In April 1995, she moved with Ryan to the Commonwealth of the Bahamas.

Thereafter, finding himself thwarted in his efforts to exercise his authorized visitation rights with Ryan, in mid-May 1995, Edwards filed a petition for contempt. After a hearing, on June 9, 1995, the trial court found Maxwell in contempt for her "willful and intentional failure to allow [Edwards] to exercise his visitation rights with the minor child of the parties." Meanwhile, Maxwell continued to live with Ryan in the Bahamas where she worked.

On September 12, 1995, Edwards filed a complaint in the Superior Court of Fulton County to seek custody of Ryan. Maxwell was properly served with that complaint while in Georgia to visit her father. Maxwell, however, did not answer the complaint. Instead, she filed a plea to jurisdiction and a motion to dismiss. Asserting that she

---

[1] A final consent order and judgment filed on April 24, 1995, required Maxwell to contact Edwards' attorney in the event that she changed her residence. Maxwell complied with this requirement.

was a nonresident, she contended that the court lacked personal and subject matter jurisdiction. The trial court found otherwise.

Relying upon OCGA § 19-9-43 (a) (1) (B), the trial court found that Georgia was the "home state" of the minor child at the time that Edwards filed his complaint to change custody. Finding that Ryan, the minor child, had not lived in the Bahamas for six months prior to when Edwards filed his complaint, the trial court determined that jurisdiction was proper. Maxwell did not appear at the hearing. The trial court entered a finding that Maxwell "refused to comply with visitation provisions of the parties' Final Judgment and Decree of Divorce and other subsequent visitation orders and was held in Contempt of Court on June 9, 1995, September 25, 1995, and February 1, 1996 for refusal to obey visitation orders." A specific finding was also made that "medical care [in the Bahamas] for the treatment of her son's serious brain condition is inadequate in comparison to the resources available in Atlanta, Georgia, where Plaintiff resides." The trial court awarded sole legal and physical custody of Ryan to Edwards on March 25, 1996.

Maxwell applied for discretionary review of the March 1996 change in custody order, arguing that the superior court lacked jurisdiction and that venue was improper. She also contested the finding regarding the caliber of medical care in the Bahamas, and she claimed that the court had improperly considered the guardian ad litem's recommendation for a change of custody. However, on May 16, 1996, this Court denied Maxwell's application for review, finding no legal basis for reversing the trial court's ruling. In declining review, we found that under OCGA § 19-9-43 (a) (1) (B), the trial court had correctly determined that Georgia was the "home state" of Ryan. This Court decided that venue was proper in Fulton County because "her residence remained in Fulton County where she owned a home and which she listed as her permanent residence on several court documents." Citing *Dyer v. Surratt*,[2] this Court also upheld the orders finding Maxwell in contempt because we found that she had waived her defense of lack of personal jurisdiction. Subsequently, the Supreme Court of Georgia denied Maxwell's petition for certiorari.

Unsuccessful in the courts of this State, Maxwell sought relief in the Bahamian judicial system where she ultimately prevailed. Having lived in the Bahamas for about a year, on April 18, 1996, Maxwell filed a custody petition in the Bahamas. In her affidavit in support of her petition, Maxwell testified that she would allow Edwards to have access to Ryan in the Bahamas.[3] She attested that "the Respondent

---

[2] *Dyer v. Surratt*, 266 Ga. 220, 222 (4) (466 SE2d 584) (1996).

[3] For some period, Ryan was apparently under a medical restriction relating to air travel. He had a temporal arachoid cyst and underwent brain surgery on three occasions.

applied for and obtained a Custody Order in Georgia at which hearing I did not appear and I was not represented. A copy of this Order is now produced and shown . . . marked as 'Exhibit DME5.' This Order seems to imply that the said child cannot obtain proper medical attention in the Bahamas which is not true."

Edwards filed an answer to Maxwell's Bahamian suit for custody. While Maxwell's petition for custody was pending, Edwards submitted an application for assistance under the Hague Convention on the Civil Aspects of Child Abduction to the Bahamian Ministry of Foreign Affairs. A decision on the merits of Maxwell's petition for custody was delayed pending the outcome of Edwards' application as required by Article 16 of the Hague Convention. Several months later, Edwards' application for assistance was refused, primarily because at the time that Maxwell had taken Ryan with her to the Bahamas, she had done so lawfully. In denying Edwards' application, the SCCB Divorce and Matrimonial Side found that "[t]he rights of custody vested in the husband did not arise until 25th March, 1996. Any application of this Court for wrongful removal or retention under Article 3 [of the Hague Convention] could only be grounded upon acts of the wife after that date. That, of course, is not the basis of this present application." The Bahamian court also found that in March 1996 when Edwards obtained custody, neither Ryan nor Maxwell had "habitual residence" in Georgia or the United States within the meaning of Article 12 of the Hague Convention. For those reasons, Edwards' application for assistance was refused.

The Bahamian court then tried Maxwell's action. In responding to Maxwell's complaint, Edwards referred that court to the superior court's findings of contempt. Edwards attested that the Superior Court of Fulton County had awarded custody of Ryan to him and that the custody award had been affirmed by the Court of Appeals of Georgia. Edwards also testified that Maxwell had gone to the Bahamas with Ryan to avoid visitation and that when he attempted to visit Ryan in the Bahamas, "the door was slammed in [my] face." He provided copies of the court rulings from Georgia.

On March 5, 1997, the SCCB Equity Side awarded Maxwell the sole custody of Ryan and authorized Edwards to have "reasonable supervised access to the said child."

Armed with certified copies of the Bahamian court orders, Maxwell then attempted to persuade the Superior Court of Fulton County to recognize both decrees. She contended that the custody order from the Bahamas was entitled to "full faith and credit." She claimed that under OCGA §§ 19-9-53 and 19-9-55 of Georgia's Uniform Child Custody Jurisdiction Act ("UCCJA"), the Bahamian custody order should be recognized. The trial court found otherwise. The trial court refused to set aside the order awarding custody to

Edwards. The trial court noted that "[a]t the time this action commenced Defendant was a Georgia resident and Georgia was the child's home state. Accordingly, this Court had jurisdiction and properly entered a final award changing custody." The trial court observed that the SCCB "refused to give credit to the decisions of this Court" and that the SCCB "explicitly refused to give reciprocal treatment to this Court's prior adjudication on the merits which had been upheld on appeal to the highest court of this State." The superior court decided that

> the SCCB erred in assuming jurisdiction since it was clear that Defendant/Mother sought to modify a custody decree of another state when she, without the consent of the person entitled to custody, had improperly detained the child in the Bahamas and was in multiple violation of the custody decrees of this Court. See OCGA § 19-9-48. Further, the SCCB erred in modifying the 3/25/96 Order to Change Custody since it failed, pursuant to the Parental Kidnapping Prevention Act, to address whether this Court had lost or failed to exercise jurisdiction. See *Henderson v. Justice*.[4] Additionally, the 2/28/97 Bahamian Order is void on its face under Georgia law for its failure to justify a change in custody. There is no indication that the court found (1) that a change of conditions affecting the welfare of the child existed, nor (2) that the welfare of the child required a modification. See *Elders v. Elders*;[5] *Johnson v. Hubert*.[6] In light of the foregoing, and upon the specific finding that to do so would violate public policy of this state, Defendant/Mother's Motion to Afford Full Faith and Credit is DENIED.

For these reasons, the superior court refused to recognize the Bahamian order changing custody back to Maxwell.

### Case No. A01A1980

On November 8, 1999, Maxwell filed a "Motion to Vacate Order of Incarceration and Order of Contempt." The incarceration order at issue was entered on February 1, 1996, and it directed that Maxwell be "immediately incarcerated" in the event that she presented herself within this State. She was to be held in jail until she agreed to comply with all of the court orders concerning visitation including

---

[4] *Henderson v. Justice*, 223 Ga. App. 591 (478 SE2d 434) (1996).
[5] *Elders v. Elders*, 206 Ga. 297 (57 SE2d 83) (1950).
[6] *Johnson v. Hubert*, 175 Ga. App. 169, 170 (1) (333 SE2d 21) (1985).

makeup visitation. In seeking to vacate that order, Maxwell countered that she was "ready and willing to permit the visitation per the Bahamian Order." Relying upon *Easley v. Easley*,[7] she argued that her willingness to abide by the Bahamian order brought her substantially into compliance with the trial court's directives.

Maxwell contends that the trial court erred in denying her motion to vacate for two reasons. First, she claims that she demonstrated her willingness to comply with the operative order concerning visitation. Next, she asserts that the trial court erred by refusing to acknowledge and enforce the orders of the SCCB and to afford full faith and credit to those orders.

Absent an abuse of discretion, this Court will not reverse a trial court's issuance of an order for civil contempt. *Beckham v. O'Brien*.[8] Here, none had been shown. "Ordinarily, the proper method for attacking an erroneous court order is to appeal it or to take some measure to persuade the ordering court to reconsider and change it. A person may not simply ignore it; if he does so, he does so at his own peril and must assume the risk of being held in contempt." Id. at 521. When her appeal of the change of custody order proved unsuccessful, Maxwell ignored it at her own peril.

A civil contempt order that imposes a jail sentence for violation of visitation rights should be conditioned upon compliance with the court's order. *Phillips v. Tittle*.[9] Here, the order at issue properly affords Maxwell a choice to comply or, alternatively, to face incarceration. See *Turman v. Boleman*.[10] Maxwell's argument that she stands willing to comply with the Bahamian order is of no effect on this issue, since her noncompliance with the scheduled court-ordered visitation occurred before the entry of the Bahamian order in February 1997. The trial court did not err in holding her in contempt for refusing to comply with the Georgia visitation orders. See *Roehl v. O'Keefe*.[11]

In *Ashburn v. Baker*,[12] the Supreme Court noted that "[t]he courts of this [S]tate have no extra-territorial jurisdiction, and cannot make the citizens of foreign states amenable to their process, or conclude them by a judgment in personam, without their consent." (Punctuation omitted.) The Supreme Court determined that personal service over nonresidents is essential and held that "[a]lthough the cases requiring 'personal service' do not specify that this must be per-

---

[7] *Easley v. Easley*, 238 Ga. 180, 181 (231 SE2d 763) (1977).
[8] *Beckham v. O'Brien*, 176 Ga. App. 518, 522 (336 SE2d 375) (1985).
[9] *Phillips v. Tittle*, 261 Ga. 820, 821 (411 SE2d 871) (1992).
[10] *Turman v. Boleman*, 235 Ga. App. 243, 245 (510 SE2d 532) (1998).
[11] *Roehl v. O'Keefe*, 243 Ga. 696, 697 (1) (256 SE2d 375) (1979).
[12] *Ashburn v. Baker*, 256 Ga. 507, 509 (2) (350 SE2d 437) (1986).

sonal service *within Georgia,* a close inspection of these cases reveals this to be the case." (Emphasis in original.) Id. Here, the record demonstrates that Maxwell was personally served in Georgia with the applications for contempt that resulted in the two orders she now seeks to contest.[13]

## *Case No. A01A1981*

Presenting several arguments, Maxwell contends that the trial court erred in refusing to recognize the change in custody order issued by the SCCB. Primarily, she claims the superior court misapplied the law.

1. Maxwell contends that in refusing to recognize the foreign judgment, the trial court erroneously relied upon the provisions of the Parental Kidnapping Prevention Act ("PKPA"), 28 USC § 1738A, which does not apply to a judgment issued in the Commonwealth of the Bahamas. We agree. By its plain terms, the PKPA applies to states which the Act defines to mean "a State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, or a territory or possession of the United States." 28 USC § 1738A (b) (8). The PKPA has no application here because the Commonwealth of the Bahamas is not a "state" within the meaning of this Act. Therefore, the SCCB was not required to determine whether the trial court in this state had lost jurisdiction under the PKPA. Compare *Henderson v. Justice,* supra at 592 (1) (a state may modify another state's custody order only if: (1) it has jurisdiction to make the custody determination and (2) the other state no longer has jurisdiction or declines to exercise jurisdiction).

2. Maxwell asserts that in the absence of statutory ambiguity, the superior court was required to recognize the custody order from the SCCB. She claims that the trial court erred by evaluating that order under the purposes espoused in the UCCJA.

The [Hague] Convention on Civil Aspects of International Child Abduction was adopted by the signatory nations in order "to protect children internationally from the harmful effects of their wrongful removal or retention and to estab-

---

[13] In an order entered on September 25, 1995, the trial court found that Defendant/Mother was served personally on September 13, 1995, at 4827 Dean Lane, Lilburn, Georgia, with the Rule Nisi and Restraining Order dated September 12, 1995, the Motion for Immediate Visitation filed September 12, 1995, the Petition for Contempt filed May 17, 1995, the Petition for Contempt filed September 12, 1995, the Petition for Change of Custody, the order holding Donna Maxwell Edwards in Contempt of Court dated June 9, 1995, and Orders Appointing Process Server to serve same.

lish procedures to ensure their prompt return to the State of their habitual residence, as well as to secure protection for rights of access."

*Friedrich v. Friedrich.*[14]

The Hague Conventions are binding in Georgia (as in all states) under the Supremacy Clause of the United States Constitution. "All Treaties made, or which shall be made, under the authority of the United States, shall be the supreme Law of the Land; and Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U. S. Const., Art. VI, Par. 2.

*Goldstein, v. Goldstein.*[15] The federal statute that implements the Hague Convention mandates that: "Full faith and credit shall be accorded by the courts of the States and the courts of the United States to the judgment of any other such court ordering or denying the return of a child, pursuant to the [Hague] Convention, in an action brought under this Act." 42 USC § 11603 (g). Thus, the superior court as well as this Court must give recognition to the order from the SCCB denying Edwards' application for assistance. Therefore, the detailed, ten-page order entered by the SCCB on Edwards' application for assistance is entitled to full faith and credit under 42 USC § 11603 (g).

In that order, the SCCB set forth a "recital of this unfortunate tale" and unequivocally demonstrated that the SCCB was acutely aware of the parties' embittered battle and bickering over visitation, access, and maintenance. In the order refusing Edwards' application for assistance under the Hague Convention, the SCCB chronicled the major events in the litigation. Acting Justice Michael Barnett, the decision's author, noted, "I am aware of the findings of the Georgia Courts on the question of residence but, with respect, I do not find them of assistance as those courts were not considering the question or issue I have to consider as to habitual residence under the Hague Convention." No evidence showed that "habitual residence" under the Hague Convention shares the same meaning as "home state" under the UCCJA. Edwards did not appeal the SCCB's decision.

Although treaty obligations and federal law require the superior court as well as this Court to recognize the order refusing the application for assistance, a similar obligation did not arise under the

---

[14] *Friedrich v. Friedrich*, 983 F2d 1396, 1399-1400 (II) (6th Cir. 1993).

[15] *Goldstein v. Goldstein*, 229 Ga. App. 862, 865 (2) (b) (494 SE2d 745) (1997).

Hague Convention as to the custody order since the treaty governs the return of children and does not purport to resolve custody conflicts. See 42 USC § 11601 et seq., International Child Abduction Remedies Act.

3. Maxwell contends that the trial court erred by declining to recognize the change in custody order of the SCCB. She claims that under the provisions of former OCGA § 19-9-53, the superior court was obligated to recognize, enforce, and afford full faith and credit to the Bahamian custody order.[16] She argues that the superior court erred in declaring the custody order "void" based on the SCCB's failure to utilize the standards that a Georgia court would have used.

For purposes of the UCCJA, the Commonwealth of the Bahamas constitutes a "state" as defined by OCGA § 19-9-42 (10). As codified under the UCCJA,

> [t]he general policies of this article extend to the international area. The provisions of this article relating to the recognition and enforcement of custody decrees of other states apply to custody decrees and decrees involving legal institutions similar in nature to custody institutions rendered by appropriate authorities of other nations, if reasonable notice and opportunity to be heard were given to all affected persons.

OCGA § 19-9-63. The record shows that these requirements were met.

First, we consider whether the SCCB properly assumed jurisdiction of this child custody dispute under statutory provisions substantially in accordance with the UCCJA. See *Youmans v. Youmans.*[17]

> The jurisdictional standards of the UCCJA are set out in § 74-504. In essence, § 74-504 (a) [OCGA § 19-9-43 for purposes herein] establishes "home state" jurisdiction, "significant connection" jurisdiction, "emergency" jurisdiction, and "appropriate forum" jurisdiction; . . . and § 74-506 (d) states that notice is not required if a person submits to the jurisdiction of the court.

Id. Here, the record shows that when the SCCB assumed jurisdiction over this child custody dispute, it did so in conformance with the

---

[16] Effective July 1, 2001, the "Uniform Child Custody Jurisdiction Act" was replaced by the "Uniform Child Custody Jurisdiction and Enforcement Act." OCGA § 19-9-40. Nevertheless, "[a] motion or other request for relief made in a child custody proceeding or to enforce a child custody determination which was commenced before July 1, 2001, is governed by the law in effect at the time the motion or other request was made." OCGA § 19-9-102.

[17] *Youmans v. Youmans*, 247 Ga. 529, 532 (276 SE2d 837) (1981).

jurisdictional standards established in OCGA § 19-9-43 (a) (1) (A) and (2) of the UCCJA. The Commonwealth of the Bahamas was the "home state" of the minor child at the time that Maxwell commenced the custody proceeding in April 1996. See OCGA § 19-9-43 (a) (1) (A). Moreover, the evidence supported a finding that it was in the child's best interest for the SCCB to assume jurisdiction since he had "significant connection" with that forum and "substantial evidence" was available "concerning the child's present or future care, protection, training, and personal relationships." OCGA § 19-9-43 (a) (2) (B).

To support her petition for custody, Maxwell testified that Ryan had lived exclusively and continuously with her from June 1992 to the present. She described the ties that Ryan had established with his school, teachers, playmates, close friends, church, and Sunday school teacher. She described herself as "pleased" with her child's medical care and noted that Ryan's primary care physician was the Chief of Pediatrics at the Princess Margaret Hospital. Maxwell also testified that she was afraid that Edwards would retaliate "[b]ased on his temper and violent behaviour." Maxwell testified that during a visit to the Bahamas, Edwards had criticized Ryan's speech and had called the child a "mute" and had told him that "he had a wicked mother who [had] kidnapped him." She further testified that Edwards had upset Ryan by telling him that "he would be taking him home next week, but that his mother would be in gaol [sic] behind steel bars" and that "he had more money than I ever would have and that he would keep me in court for the next twenty years." Maxwell alluded to a notation allegedly made in a 1994 report by the guardian ad litem that Edwards had admitted using illegal drugs and had entered a plea to the criminal charge of reckless conduct with a firearm. The record supports a finding that, from the child's perspective, his "home state" was the Commonwealth of the Bahamas where he lived continuously since he was not quite three years of age and where his friends, school, church, and medical providers are located. See generally *Mock v. Mock*[18] (under Georgia law, custody must ultimately be decided based on the best interest of the child).

Without question, Edwards had notice and an opportunity to respond to the proceedings. In fact, a letter from his Bahamian counsel indicates that Edwards responded to the custody proceeding there and, in fact, participated in that proceeding for a time. Jeanne I. Thompson, Maxwell's attorney, testified that at a hearing, counsel for Edwards had informed the SCCB that Edwards would be making a cross application for custody. The record further shows that Edwards appeared in person before the SCCB in August and Septem-

---

[18] *Mock v. Mock*, 258 Ga. 407 (369 SE2d 255) (1988).

ber 1996. And, despite the SCCB's rescheduling of the final hearing on the custody petition to ensure his presence, Edwards voluntarily declined to appear before that court either in person or through counsel.[19] See *Knothe v. Rose*[20] (defendant's failure to properly respond to complaint and summons did not preclude entry of adverse judgment in another country). Under similar facts, this Court found that the trial court abused its discretion by refusing to domesticate a West German judgment. Id. The UCCJA requires recognition of foreign decrees in that: "The courts of this state shall recognize and enforce an initial or modification decree which was made by a court of another state which had assumed jurisdiction under statutory provisions substantially in accordance with this article." OCGA § 19-9-53. Since the SCCB assumed jurisdiction substantially in accordance with the UCCJA, under the terms of former OCGA § 19-9-53, the superior court was required to recognize and enforce the Bahamian custody order.

This result is not inconsistent with the Hague Convention which expressly crafts out an exception even to requiring the return of a child wrongfully removed, when "it is demonstrated that the child is now settled in its new environment." Article 12 of the Hague Convention. The focal point of analysis is the "habitual residence" of the child, not his parents. See *Feder v. Evans-Feder.*[21] Although the Hague Convention does not define "habitual residence" or provide a structure for resolving disputes about legal custody on the merits, it presumes that such disputes are properly resolved in the country of the child's habitual residence. *Currier v. Currier.*[22] After the SCCB denied Edwards' application for assistance and found that Ryan had not been wrongfully removed from this State, the SCCB could properly entertain the custody petition without running afoul of the Hague Convention. See *Friedrich v. Friedrich*, supra at 1402. The overwhelming and undisputed evidence showed that the Commonwealth of the Bahamas was the country of the child's habitual residence at the time that the SCCB considered the custody issue. The child's social, educational, familial, religious, and medical ties were indisputably in the Commonwealth.[23]

A child is not a pawn to be deployed in legal maneuvers between

---

[19] By letter dated November 19, 1996, Edwards' counsel advised that "[u]nfortunately we have not been further instructed on the matter of The Guardianship and Custody of Infant Act, Chapter 118 of The Revised Laws of the Commonwealth of The Bahamas 1982. On our last meeting with Mr. Edwards, he instructed us not to represent his interests on this until further notice."

[20] *Knothe v. Rose*, 195 Ga. App. 7, 10 (392 SE2d 570) (1990).

[21] *Feder v. Evans-Feder*, 63 F3d 217, 222-223 (3rd Cir. 1995).

[22] *Currier v. Currier*, 845 FSupp. 916, 920 (D. N.H. 1994).

[23] Ryan's grandparents also were living in the Bahamas.

warring parents. While we disapprove of the tactics and manipulations used by both parents over the last nine years, Edwards cites no law and we have found none that precluded Maxwell from availing herself of the judicial system of the Commonwealth of the Bahamas where she and Ryan apparently continue to legally reside. Therefore, in these most unusual circumstances, we find that under the fundamental principles of international law and comity and also under OCGA § 19-9-53 of the UCCJA, the superior court erred in refusing to domesticate the custody order issued by the SCCB, the terms of which would take priority over the conflicting terms of the previous Georgia order which awarded custody of Ryan to Edwards. *Knothe v. Rose*, supra at 10.

As a final matter, we recognize that the SCCB apparently considered or was apprised of certain evidence of misconduct and violence in which Edwards allegedly engaged prior to and while visiting the Bahamas. Included in the appellate record are copies of three outstanding arrest warrants against Edwards for "attempt to steal a child" and a warrant alleging that Edwards "did Intentionally and Unlawfully Cause Grevious [sic] Harm to Donna Lynn Maxwell Contrary to Section 271 of the Penal Code, Ch 77." According to Maxwell's uncontradicted testimony, on October 8, 1998, "John Edwards forcibly and with violence broke into my residence in the Bahamas for the purpose of kidnaping Ryan Maxwell." She testified that "[t]he October 1998 attack by John Edwards was committed at my home, and in the presence of my son, Ryan Maxwell. Ryan was traumatized by the attack. I was hospitalized. A true and correct copy of the medical report reflecting the injuries which I received is attached hereto." She also testified that the Commonwealth had instituted formal extradition proceedings for Edwards' return to face pending criminal charges. Notwithstanding our holding that Maxwell must fully comply with the trial court's directives and purge herself of contempt or face the sanction of immediate incarceration, we recognize the potential for problems in accommodating Edwards' visitation rights. Therefore, in supervising this visitation, we direct the trial court to carefully consider the child's safety as well as that of his mother in light of the testimony and evidence pertaining to Edwards' purported use of violence. See OCGA § 19-9-3 (a) (3). The unfortunate states in which the parties find themselves are largely the result of their animosity and conduct toward each other. It is hoped that the best interest of the child becomes the most important consideration to these individuals.

*Judgment affirmed in Case No. A01A1980. Judgment reversed in Case No. A01A1981 and case remanded with direction. Pope, P. J., and Mikell, J., concur.*

*George B. Spears*, for appellant.

*Thompson, Fox, Chandler, Homans & Hicks, Robert L. Chandler*, for appellee.