2008 VT 86

## Michelle M. Miller v. Keith E. Miller

[965 A.2d 524]

No. 06-504

Present: **Dooley, Johnson, Skoglund and Burgess, JJ., and Teachout, Supr. J., Specially Assigned**

Opinion Filed August 22, 2008

*Maureen O'Reilly, Vermont Legal Aid, Inc.,* Rutland, and *Sandra L. Paritz, Vermont Legal Aid, Inc.,* St. Johnsbury, for Plaintiff-Appellant.

*Sigismund J. Wysolmerski* of *Wysolmerski Law Office P.C.,* Rutland, for Defendant-Appellee.

¶ 1. **Skoglund, J.** Mother appeals from a family court order denying her request to recognize a Canadian child-custody judgment and to relieve her of an earlier contempt adjudication. We hold that the trial court erred in declining to recognize the foreign judgment, and that the contempt order has since become moot. Accordingly, we reverse.

¶ 2. Like many multi-jurisdictional custody disputes, this appeal arrives with a long and tangled factual and procedural history. The parties lived together in Vermont for a number of years before their child was born in March 1994. They were married in 1996 but separated one year later and were divorced in March 1999 pursuant to a final judgment of the Bennington Family Court. By agreement of the parties, the court awarded mother sole legal and physical rights and responsibilities for the child and granted father liberal visitation. By the time of the divorce, mother had moved with the child to Massachusetts. The record discloses that in May 2000 a Massachusetts family court issued a temporary ex parte abuse-prevention order at mother's request, prohibiting father from having any contact with the child. In June 2000, following a hearing at which father appeared, the court

issued a final abuse-prevention order again prohibiting father from having any contact with the child. The order was scheduled to expire in one year.[1]

¶ 3. Father subsequently moved to reinstate visitation in Massachusetts. Following a hearing, the Massachusetts family court issued an order granting father supervised visits with the child and providing for a further review in six months conditioned on father's successful completion of six supervised visits. Based on father's behavior during the first visit, however, the visitation supervisor cancelled the second visit and wrote a letter to the court, in July 2000, requesting that future visits occur in a different setting with a "high[er] degree of security (on-duty police officer, weapon check)." The letter cited concerns about father's "contained rage" and "emotional stability" and characterized him as a "high risk" client. Apparently, no further visits occurred thereafter. Nevertheless, in August 2000, the Massachusetts family court issued an order at the parties' request providing that "all further proceedings concerning the care, custody and visitation of the minor child" would be "conducted in Massachusetts and not in Vermont." At the same time, the Bennington Family Court granted the parties' joint motion to recognize Massachusetts's jurisdiction over the matter.

¶ 4. In early January 2001, mother and child began a series of moves which she claims were necessitated by father's harassment and threats. Mother states that she moved initially into a battered women's shelter in Pittsfield, Massachusetts, and thereafter fled to Florida when father discovered her location in Massachusetts. She further claims that she left Florida out of a concern that father had discovered her there, and ultimately moved to a shelter for battered women in the Province of Quebec, Canada, in May or June 2001. Father contends that he was unaware of mother's whereabouts during this period.

¶ 5. In June 2002, in response to father's motion, the Massachusetts family court issued an order providing that, in light of mother's "unknown" location and father's continued residence in Vermont, the latter represented the most appropriate venue to exercise jurisdiction. Father then filed successive motions in the Bennington Family Court to enforce the visitation provisions of

---

[1] The record shows that mother had filed an earlier petition for relief from abuse in the Bennington Family Court, which was denied in April 2000.

the original Vermont divorce decree, to obtain temporary custody, and to hold mother in contempt. Mother was served by publication but did not appear at a scheduled hearing in August 2002, which resulted in a brief, emergency order transferring custody to father.

¶ 6. In September 2002, the court issued a written decision. The court acknowledged that a review of the child's best interests was difficult because of his absence from the state for the last three years and the lack of information about his present physical and emotional health. Nevertheless, the court expressed concern as to whether the child was receiving adequate medical attention for a seizure disorder that had come to the court's attention during an earlier abuse-prevention hearing. The court also noted that mother had been found to suffer from depression in the final divorce judgment, that her petition for relief from abuse in Vermont had been denied, and that she "may be of unstable personality . . . [and] in the throes of some mental illness . . . which would make her an unfit guardian for the child." Accordingly, pending "a full [e]videntiary [h]earing to consider the child's best interest" the court ordered that custody be transferred to father "until further [h]earing of the [c]ourt." The court also found mother to be in contempt for her "willful failure to provide [father] with his right to parent child contact" as provided by the court's earlier orders.

¶ 7. After the hearing before the Bennington Family Court on August 21, 2002, but before the court issued its decision in September, mother filed a motion to terminate father's right to visitation and for child support in the family court of the Province of Quebec, Canada, where she had taken up residence after fleeing from Florida. An expert psychological evaluation of mother and the child was submitted to the Canadian court in October 2002. The psychologist's report states that it was based on interviews with mother and the child as well as a review of a number of documents, including the Bennington Family Court decision of September 2002, notes from the child's former teacher in Massachusetts and current teacher in Quebec, and reports filed with the Massachusetts family court by the visitation supervisor. The psychologist's report recounts in detail mother's allegations of father's physical and psychological abuse, harassment, and stalking, some of which allegedly occurred in the child's presence. The expert described mother as "sad but always in control of her emotions," coherent and well organized, and without any signs of

psychosis, mood disorders, or other personality disorders. She was, in the expert's opinion, "in good mental health," appeared to function well, and despite the recent instability in her life "had been able to take good care of" the minor. As to the child, then eight years old, the expert noted that he was "successful" in school and "well integrated into his class group," was obviously "bright," expressed himself well, and established an easy relationship with the expert. Although mother reported that the child had an epileptic condition which required him to take a daily medication, he remained physically vigorous. As for the child's views toward father, the expert concluded from the child's remarks that he had witnessed father make numerous threats and denigrating comments against mother and himself, and as a result had developed a strongly negative perception of father, stating in categorical terms that he did not wish to resume parent-child contact. The expert concluded that an abrupt resumption of visitation with father would have a traumatic and destabilizing impact on the child.

¶ 8. Father was served with mother's Canadian petition by mail, and subsequently moved to dismiss the petition and transfer jurisdiction to Vermont. In May 2003, the Canadian court entered an order granting temporary custody to mother. The following month, it issued a nine-page decision denying father's motion to dismiss. The court explained that under Canadian law it had the discretion to decline jurisdiction if it determined that the courts of another jurisdiction were better positioned to resolve the dispute, and that any decision must "be taken in [the child's] interest and with respect to his rights." These interests should include, according to the court, "the moral needs, intellectual, affective and physical needs of the child, his age, his character, his family circumstances and the other aspects of the situation." Based upon its review of several exhibits, including the expert psychological evaluation and the materials on which it relied, the court found that father's "attitude and comportment" toward mother and the child and the risks of reunification with father militated against a transfer of jurisdiction.

¶ 9. In July 2004, father filed a motion with the Canadian family court to have his own expert psychologist evaluate mother and the child, and thereafter to grant custody to father. For reasons unclear from the record, however, father subsequently withdrew the motion. In February 2005, the Canadian court issued a final

judgment awarding custody of the eleven-year-old child to mother and reserving the issue of visitation with father. Father appealed the ruling, which the Canadian appellate court affirmed in October 2005.

¶ 10. In January 2006, mother returned to Vermont and was arrested by federal marshals, based on federal charges of international parental kidnapping.[2] Mother was transferred to state custody on the outstanding contempt adjudication, and a show-cause hearing was held in which mother was given the opportunity to purge herself of the contempt by disclosing the child's whereabouts; she refused, and consequently remained incarcerated. In February 2006, mother moved to dismiss the contempt proceeding on the ground that the court lacked subject-matter jurisdiction to issue the August and September 2002 orders transferring custody to father and holding her in contempt for interfering with father's visitation rights.[3] The court denied the motion, concluding that Vermont had jurisdiction under 15 V.S.A. § 1032(a)(2), which provides that the court may exercise jurisdiction if it is in the best interests of the child, the child and at least one contestant have a "significant connection with this state," and "there is available in this state substantial evidence concerning the child's present or future care, protection, training, and personal relationships."[4]

---

[2] 18 U.S.C. § 1204(a) punishes by fine or imprisonment anyone who "removes a child from the United States, or attempts to do so, or retains a child (who has been in the United States) outside the United States with intent to obstruct the lawful exercise of parental rights." We take judicial notice of the fact that, following a jury trial in federal district court, mother was convicted of the charge in July 2007. As noted, *infra*, n.11, the federal court subsequently sentenced mother to time served on the state contempt adjudication.

[3] Mother had filed a similar motion with the Bennington Family Court in August 2004, apparently in response to father's motion for "disclosure of records" filed in July 2004. The court dismissed mother's motion as "moot" based on its earlier order denying father's motion.

[4] The statute on which the court relied, 15 V.S.A. § 1032, which is modeled on the Uniform Child Custody Jurisdiction Act (UCCJA), provides that Vermont may exercise jurisdiction if: (1) Vermont is the child's "home state"; (2) Vermont jurisdiction is in the child's best interests, the child and at least one contestant have a "significant connection" with Vermont, and there is available in Vermont "substantial evidence" concerning the child's "present or future care, protection, training, and personal relationships"; (3) the child is in Vermont and needs emergency protection; or (4) no other state has jurisdiction or another state has declined jurisdiction in favor of Vermont and it is in the best interests of the child for Vermont to assume jurisdiction. *Id.* § 1032(a)(1)-(4); see generally *In re D.T.*,

Mother appealed from the denial, but the appeal was dismissed in May 2006, for failure to comply with a scheduling order.

■ ¶ 11. In June 2006, mother filed a motion seeking relief from the judgment of contempt and recognition of the Canadian custody order in furtherance of the interests of justice and the best interests of the child, pursuant to Vermont Rule of Civil Procedure 60(b)(6).[5] The trial court denied the motion, observing that mother had failed to appeal either the 2002 judgment of contempt or the 2006 denial of her motion to dismiss, and that Rule 60(b) was not a substitute for timely appeal. The court also declined to recognize the Canadian family court judgment, ruling that it could not determine from the Canadian orders — which were in French — whether Canada had properly exercised jurisdiction. Mother moved to reconsider, pointing out that, in fact, she had previously submitted English translations. The court denied this motion as well, finding that it remained unable to determine whether the Canadian court had properly exercised jurisdiction. This appeal followed.

I.

■ ¶ 12. Although the parties focus largely on whether Canada or Vermont had jurisdiction, as explained more below the critical question — in our view — turns on which was ultimately the "more appropriate forum" to resolve this protracted dispute under the Uniform Child Custody Jurisdiction Act.[6] We begin by noting the overall relevance of UCCJA principles despite the complicating

---

170 Vt. 148, 151-52, 743 A.2d 1077, 1080 (1999) (discussing grounds for assertion of jurisdiction under UCCJA).

[5] Rule 60(b) provides that, "[o]n motion and upon such terms as are just," a court may relieve parties from a final order on six separate grounds, including a catch-all provision for "any other reason justifying relief from the operation of the judgment." V.R.C.P. 60(b)(6); see Bingham v. Tenney, 154 Vt. 96, 99, 573 A.2d 1185, 1186 (1990) (Rule 60(b)(6) "is invoked to prevent hardship or injustice").

[6] This section provides that a court which has jurisdiction to make an initial or modification decree may nevertheless decline to exercise its jurisdiction "if it finds that it is an inconvenient forum to make a custody determination under the circumstances of the case and that a court of another state is a more appropriate forum." 15 V.S.A. § 1036(a). In making such a determination "the court shall consider if it is in the best interest of the child" to decline jurisdiction, and to this end "may take into account the following factors, among others:

(1) if another state is or recently was the child's home state;

presence of a foreign jurisdiction. The UCCJA expressly provides that its "general policies . . . extend to the international area," 15 V.S.A. § 1051, and courts and commentators have consistently interpreted this provision to confer comity, or recognition, to child custody proceedings and determinations of foreign nations that meet minimal standards of due process and promote the UCCJA's fundamental goals.[7] See, e.g., *McFaull v. McFaull*, 560 So. 2d 1013, 1014 (La. Ct. App. 1990) (holding that "the general policies of the UCCJA . . . extend to the international area and recognition and enforcement of custody decrees are extended to other countries if there has been reasonable notice and the opportunity to be heard"); *Garg v. Garg*, 881 A.2d 1180, 1204 (Md. Ct. Spec. App. 2005) (observing that "numerous other states have concluded that the UCCJA applies to international custody disputes" and collecting cases); *Ivaldi v. Ivaldi*, 685 A.2d 1319, 1325 (N.J. 1996) ("The majority of state courts that have considered the issue have held, either explicitly or implicitly, that the term 'state' may include a foreign nation."); see generally D. Blair, *International Application of the UCCJEA: Scrutinizing the Escape Clause*, 38 Fam. L.Q. 547, 557 (2004) (observing that, with few exceptions, "courts have applied the UCCJA in a straightforward manner in international custody disputes."); Note, *American and International Responses to International Child Abductions*, 16 N.Y.U. J.

---

(2) if another state has a closer connection with the child and his family or with the child and one or more of the contestants;

(3) if substantial evidence concerning the child's present or future care, protection, training, and personal relationships is more readily available in another state;

(4) if the parties have agreed on another forum which is no less appropriate; and

(5) if the exercise of jurisdiction by a court of this state would contravene any of the purposes of this chapter.

*Id.* § 1036(c).

[7] This section provides, in its entirety, as follows:

The general policies of this chapter extend to the international area. The provisions of this chapter relating to the recognition and enforcement of custody decrees of other states apply to custody decrees and decrees involving legal institutions similar in nature to custody rendered by appropriate authorities of other nations if reasonable notice and opportunity to be heard were given to all affected persons.

15 V.S.A. § 1051.

Int'l L. & Pol. 415, 428 (1984) ("[T]he [National Conference of Commissioners on Uniform State Law] made the UCCJA's basic policies applicable to international cases.").

¶ 13. An understanding of the UCCJA's international reach was implicit in *In re Cifarelli*, 158 Vt. 249, 254, 611 A.2d 394, 397 (1992), where we upheld a trial court ruling that Bermuda had properly exercised jurisdiction over certain custody and visitation issues concerning a minor notwithstanding the fact that a Vermont court had entered the initial order. The child in question had lived in Vermont for only a few months but had been a resident of Bermuda for over a year at the time of the superior court order dismissing the action in favor of Bermuda; information about the child's physical and psychological health and development were more readily available in Bermuda, where that country's social services agency had investigated her circumstances; and the child's primary care provider and physicians resided in Bermuda. Thus, we concluded that, "when the superior court dismissed the action, Vermont was an inconvenient forum according to the provisions of 15 V.S.A. § 1036," and Bermuda "was the most appropriate forum" to exercise jurisdiction. *Id.* at 254-55, 611 A.2d at 397-98.

¶ 14. Other courts have also recognized that it may be appropriate in certain circumstances to decline jurisdiction in favor of a foreign judgment where the UCCJA factors demonstrate that it would be in the best interests of the child. See, e.g., *Plas v. Superior Court*, 202 Cal. Rptr. 490, 499 (Ct. App. 1984) (holding that France represented the more convenient forum to resolve custody dispute); *Ivaldi*, 685 A.2d at 1327 (noting that "[t]he interests of the child are critical in determining which jurisdiction provides a more convenient forum" and remanding for the court to decide whether to decline jurisdiction in favor of Moroccan divorce judgment); *Middleton v. Middleton*, 314 S.E.2d 362, 368 (Va. 1984) (ruling that Virginia would "treat England as the equivalent of a statutory 'home state' under the *forum non conveniens* provisions of the Act" and declining jurisdiction where child's contacts with England were stronger); *In re Ieronimakis*, 831 P.2d 172, 179 (Wash. Ct. App. 1992) (holding that Greece was the more appropriate forum to adjudicate child custody where it was the child's residence, contained the most significant family connections, and held the most substantial evidence concerning the child's welfare).

¶ 15. As noted, the parties here have focused more on whether Canada had jurisdiction than whether it should have exercised it. That concern is understandable in light of the trial court ruling, which summarily dismissed the Canadian decision to retain jurisdiction on the ground that its failure to make findings relative to the criteria for the exercise of jurisdiction set forth in 15 V.S.A. § 1032 made it impossible to "presently determine whether the Canadian court properly exercised jurisdiction substantially in accordance with the UCCJA." Upon careful review, however, we find that the trial court ruling does not withstand scrutiny.

¶ 16. Canada has not, of course, enacted the UCCJA, and its findings do not explicitly address the jurisdictional criteria of § 1032 as such. There was no real dispute before the Canadian court, however, that mother and the child had been living in Quebec for more than one year when she filed her custody petition in the Canadian family court in September 2002. Although the specific address that mother initially provided proved to be inaccurate, the Canadian court relied on evidence in the expert evaluation indicating that mother had settled in Quebec almost sixteen months before she filed the petition. Furthermore, father admitted in his Canadian pleadings that mother and the child had resided in Quebec for at least a year before she filed her petition, observing in one motion that it was not "until August 2002, that [father] became aware that [mother] and his child had moved to the jurisdiction of the District of St.-Francois, Province of Quebec." Moreover, it is apparent that the Canadian court considered its assumption of jurisdiction to be in the interests of the child based on his Quebec residence, the significant evidence presented to the court concerning his physical and emotional health, and the perceived risks of returning the child to father in Vermont. The Canadian decision thus evinces at least two viable grounds for its exercise of jurisdiction under the UCCJA: as the child's home state, under § 1032(a)(1), and as the state where at least one contestant and the child have a significant connection, where substantial evidence concerning the child's welfare may be found, and where the assumption of jurisdiction would serve the child's interests, under § 1032(a)(2)-(4).

¶ 17. Mother's assertion to the contrary notwithstanding, it is similarly evident that the Bennington Family Court could reasonably assert jurisdiction on at least one ground as well, inasmuch as Massachusetts had expressly declined to exercise jurisdiction in

favor of Vermont, and father and his family continued to reside in Vermont. See *id.* § 1032(a)(4) (Vermont has jurisdiction if "another state has declined to exercise jurisdiction on the ground that this state is the more appropriate forum to determine the custody of the child, and it is in the best interest of the child that this court assume jurisdiction").

¶ 18. The question of whether jurisdiction *exists*, however, is separate from the question of whether it should be *exercised*. As to that issue, the record here shows that while Vermont may have issued the initial divorce decree and custody order in March 1999, the child had already left Vermont to live with mother in Massachusetts, had been out of Vermont for three years when father filed his petition for modification in August 2002, and indeed is acknowledged by all parties to have lived outside of Vermont for the last nine years. See *Rocissono v. Spykes*, 170 Vt. 309, 318, 749 A.2d 592, 599 (2000) (listing factors commonly considered by courts in deciding whether to decline jurisdiction, including "the location of the children at the time of the proceeding" and the "length of time that the children have or had been in or out of the forum state at the time the proceeding commenced"); see also *Sampson v. Johnson*, 846 A.2d 278, 289 (D.C. 2004) (directing trial court on remand to determine appropriate forum based on "the situation as it exists following the remand").

¶ 19. It is equally evident from the record that substantial evidence relating to the child's welfare and development was "more readily available" in Canada than Vermont when father filed his modification motion. 15 V.S.A. § 1036(c)(3). The Bennington Family Court's September 2002 ruling acknowledged as much, noting the difficulty of obtaining evidence concerning the child's best interests as he had not been before a Vermont court or apparently in the state since he was five years old. Further, we note that the court's expressed concerns about mother's state of mind and ability to care for the child's neurological condition were purely speculative. The Canadian judgment, in contrast, rested on a relatively recent, comprehensive evaluation of the emotional and physical health of mother and the child; the child's adjustment at school, intellectual development, and perceptions of father; and the likely emotional impact on the child of an abrupt reunification with father. Nor can we ignore the Canadian court's obvious concern about the risks to mother and the child if compelled to litigate in father's home state. We need not credit all of mother's allegations

of abuse to accept her belief, and the Canadian court's implicit conclusion, that Canada provided a more secure forum. See, e.g., *Stoneman v. Drollinger*, 2003 MT 25, ¶ 34, 64 P.3d 997 (declining jurisdiction in Montana based, in part, on history of domestic violence and the mother's sense "that she feels safer in Washington where . . . [the father] does not know her address or daily pattern of activities").[8] Therefore, despite father's continued residence in Vermont, the conclusion is inescapable that Canada had a closer connection with the child and more substantial evidence concerning his health and welfare when father filed his motion, and that evidence and connection with Canada have undoubtedly only increased over time.

■ ■ ¶ 20. Balanced against these factors is the inescapable fact of mother's patent and longstanding interference with father's opportunity to establish parent-child contact. One of the fundamental goals of the UCCJA is the prevention of "forum-shopping" by one parent seeking an advantage over the other, *Rocissono*, 170 Vt. at 318, 749 A.2d at 598, and one of the specific statutory factors we must consider in determining an appropriate forum is whether the exercise of jurisdiction would "contravene any of the purposes" of the UCCJA. 15 V.S.A. § 1036(c)(5).[9] There is no

---

[8] *Stoneman* was based, in part, upon a provision of the Uniform Child Custody Jurisdiction and Enforcement Act (UCCJEA), the successor to the UCCJA, which many states (though not Vermont) have enacted, explicitly providing that a court deciding whether to exercise jurisdiction may consider "whether domestic violence has occurred and is likely to continue in the future and which State could best protect the parties and the child." UCCJEA, § 207(b)(1).

[9] We have also recognized that the Parental Kidnapping Prevention Act (PKPA), 28 U.S.C. § 1738A(a), applies equally to visitation and custody orders of another state, *Miller-Jenkins v. Miller-Jenkins*, 2006 VT 78, ¶ 12, 180 Vt. 441, 912 A.2d 951, but there is no claim here that the PKPA, a federal law for determining whether one state must give full faith and credit to an order of another state, applies in this international context. See *Edwards v. Edwards*, 563 S.E.2d 888, 893 (Ga. Ct. App. 2002) (holding that the PKPA "has no application" to custody dispute involving Commonwealth of the Bahamas because it "is not a 'state' within the meaning of this Act"); *Ivaldi v. Ivaldi*, 672 A.2d 1226, 1232 (N.J. Super. Ct. App. Div. 1996) ("[T]here is nothing in the language or history of the PKPA suggestive of a congressional intent to apply the statute to decrees issued by foreign" tribunals.); *Ieronimakis*, 831 P.2d at 183 n.7 ("[A]n examination of [the PKPA] reveals that it is not applicable to international custody disputes."); see generally R. Crouch, *An Intricate Maze of Child-Snatching Statutes*, 23 Fam. Advoc. 29, 30 (2001) (explaining that "[t]he PKPA brings to bear the rule of full faith and credit between American states . . . [which] has no application in international cases.").

evidence here that mother was consciously forum-shopping in moving to Canada rather than, as she claimed, seeking to evade an allegedly abusive former spouse, but the ultimate effect in depriving father of his legal rights was the same. Nevertheless, in matters as serious as determining a child's future, our paramount concern must remain focused on the welfare of the child. See *In re Adoption of Baby Girl B.*, 867 P.2d 1074, 1079 (Kan. Ct. App. 1994) ("The prime consideration in determining if a court is an inconvenient forum is the best interests of the child."). Accordingly, courts have recognized that, in deciding whether or not to exercise jurisdiction under the UCCJA, the important goal of discouraging parental misconduct in child custody matters may — in rare instances — be outweighed by considerations relating to the best interests of the child. See, e.g., *Bergeron v. Bergeron*, 492 So. 2d 1193, 1203 (La. 1986) ("If the best interests of all children are to be served . . . [t]he imperative to discourage abduction and other violations of custody orders may, in extraordinary circumstances, be subordinated to the paramount concern in all custody matters for the welfare of the child."); *In re Clausen*, 502 N.W.2d 649, 682 (Mich. 1993) ("Even in child snatching cases, courts have placed consideration of the child's best interests ahead of punishment of the wrongdoer."); *State ex rel. Rashid v. Drumm*, 824 S.W.2d 497, 502 (Mo. Ct. App. 1992) (observing that the "clean hands" doctrine "is a discretionary ground for denying jurisdiction and does not supersede the best interests of the child"); *Nehra v. Uhlar*, 402 A.2d 264, 267 (N.J. Super. Ct. App. Div. 1979) (recognizing that the children's "welfare should not be sacrificed on the altar of judicial punishment of a parent for her wrongdoing in removing the children from a foreign jurisdiction, or in violating the order of a foreign court").

■ ¶ 21. For the reasons previously discussed, we conclude that this is one of those rare cases where the best interests of the child must take precedence over the policy goal of deterring parental wrongdoing. As noted, at the time of the original petition the child had been absent from Vermont for three years, and the family court consequently had no real evidentiary basis on which to evaluate the child's welfare or determine his best interests for purposes of a custodial placement. The Canadian court, in contrast, was home to both the mother and the child and had access to current information concerning the child's schooling, physical and emotional well-being, and attitude towards his parents. While

we are reluctant to give even an appearance of rewarding parental misconduct, we cannot ignore the impact that distance and the passage of time have exerted in this matter. We conclude, therefore, that Canada was the more appropriate forum to resolve this matter, and that the Bennington Family Court should have declined jurisdiction in favor of the foreign forum.[10]

■ ¶ 22. Several procedural objections to this conclusion are, of course, immediately apparent. First, the Bennington Family Court was not apprised of the Canadian proceeding when it issued its decision in September 2002, and thus can hardly be faulted for failing to defer to a proceeding of which it was unaware. Mother's petition for relief from judgment, however, provided an opportunity to rectify this omission in the interests of the child, and we conclude that such relief was appropriate for the reasons stated. See *Riehle v. Tudhope*, 171 Vt. 626, 627, 765 A.2d 885, 887 (2000) (mem.) (recognizing that Rule 60(b)(6) "is intended to accomplish justice in extraordinary situations that warrant the reopening of final judgments after a substantial period of time"). We recognize as well that mother failed to appeal either the 2002 modification ruling (she was served by publication but claimed to be unaware of the ruling) or the subsequent 2006 order denying her motion to dismiss. As we have explained, however, and as other courts have also recognized, the important interest in finality of judgments must occasionally — in rare cases — yield to the best interests of the child. See, e.g., *Livingston v. Livingston*, 572 P.2d 79, 86 (Alaska 1977) (holding that the "paramount criterion of the best interest of the child" in custody matters justified invocation of Rule 60(b) to reopen final divorce judgment in light of subsequent disclosures); *In re Drummond*, 945 P.2d 457, 462 (N.M. Ct. App. 1997) (concluding that "[w]here the best interests of the child demand it, the exceptional circumstances" provision of Rule 60(b) should be used to reopen adoption decree); *In re Matyaszek*, 824 N.E.2d 132, 143 (Ohio Ct. App. 2004) (noting that Ohio courts have "recognized that the child's best interests are paramount in determining whether relief from judgment is appropriate"); *State ex rel. M.L.B. v. D.G.H.*, 363 N.W.2d 419, 428 (Wis. 1985) (holding

---

[10] We recognize that the family court did not specifically address the forum non conveniens issue, but where, as here, the record evidence is before us and the litigation has already dragged on for years, a prompt resolution rather than a remand for further findings serves the best interests of the child.

that final custody and support judgment may be reconsidered on motion for relief from judgment where failure to do so would have "significant future ramifications for . . . the child"). We conclude that this is such a case.

¶ 23. Finally, we note that, although apprised of the Bennington Family Court order, the Canadian court apparently made no effort to contact the Vermont family court to coordinate their efforts, as required by the UCCJA. See 15 V.S.A. § 1036(d) (requiring state courts to communicate with one another to "exchange information pertinent to the assumption of jurisdiction by either court with a view to assuring that jurisdiction will be exercised by the more appropriate court"). Although the Canadian court was obviously not bound by this provision, comity would certainly have called for a higher level of international cooperation than was evidenced here. The UCCJA is not predicated upon reciprocation, however, and judicial proprieties must not be preserved at the expense of the interests of the child. *Cifarelli*, 158 Vt. at 253, 257, 611 A.2d at 397, 399 (observing that the UCCJA "is not a reciprocal law" and holding that "[a] failure to comply strictly with the communication provision does not require reversal"). Accordingly, we discern no procedural impediment to recognition of the Canadian judgment.

¶ 24. Nothing in the dissent undermines these fundamental conclusions. Nevertheless, several of the dissent's claims merit a response.

¶ 25. As a threshold matter, we simply cannot let pass the dissent's unnecessary characterization of the parties. While willing to tarnish mother's character based on speculative findings lacking evidentiary support, the dissent virtually ignores documented evidence of father's physical and psychological violence. The dissent makes much of the family court's denial of mother's motion for relief from abuse, overlooking the Massachusetts order granting such relief, as well as the visitation supervisor's letter to the Massachusetts court expressing such concern about father's "contained rage" and "emotional stability" that she requested a more secure setting and warned that release of the letter to father would "increase the likelihood of out of control behavior" toward mother, the child, and the supervisor herself. Nor is there sufficient acknowledgment by the dissent of the Canadian psychologist's report setting forth in substantial detail mother's

allegations concerning father's physical and emotional violence, as well as the child's report concerning father's threats.

¶ 26. We do not raise this issue to excuse mother's misconduct or to indict father's. Our role is not to make a case for either party, but to state the facts plainly and without embellishment. An argument for upholding the trial court's refusal to recognize the Canadian judgment can certainly be made; it does not require manipulation of the record to do so.

¶ 27. The dissent's tendency to overstate the case does not end with the record evidence. It asserts that the Court "bypasses" several legal standards "to reach its result." *Post,* ¶ 34. This claim is also baseless. As a procedural matter, the dissent argues that, having failed to appeal either the 2002 order or the 2006 denial of her jurisdictional complaint, mother "was foreclosed" from seeking relief under Rule 60(b). *Post,* ¶ 41. We have, indeed, repeatedly observed that Rule 60(b) is not a substitute for appeal, explaining that the important interest in finality of judgments demands that the rule be applied "guardedly," *Levinsky v. State,* 146 Vt. 316, 318, 503 A.2d 534, 536 (1985) (per curiam denial of motion for reargument), and only in "extraordinary" circumstances. *Riehle,* 171 Vt. at 627, 765 A.2d at 887. Our holding that the instant case represents one of those rare instances justifying relief does not represent an abandonment of the rule but rather an application of it under "the historical authority of the courts of equity to reform judgments in special circumstances." *Levinsky,* 146 Vt. at 318, 503 A.2d at 536 (quotation omitted); see also *Kellner v. Kellner,* 2004 VT 1, ¶ 12, 176 Vt. 571, 844 A.2d 743 (mem.) ("Finality and repose sometimes must yield to the interests of justice . . . ."); *Koch v. Billings Sch. Dist. No. 2,* 833 P.2d 181, 188 (Mont. 1992) (noting the general principle that while it is ordinarily not permissible to rely on Rule 60(b) "to remedy a failure to take an appeal," this is not "an inflexible rule and in unusual cases a party who has not taken an appeal may obtain relief on motion") (quotations omitted).

¶ 28. The dissent also asserts that, having argued for recognition of the Canadian judgment on the ground that Canada rather than Vermont had jurisdiction, mother waived any claim that Canada was the more convenient forum. Just as there are cases where a failure to appeal may not be fatal to relief from judgment, there are instances where a failure to object or raise a

specific issue does not preclude its consideration on appeal. See *Cardiff v. Ellinwood*, 2007 VT 88, ¶ 12, 182 Vt. 602, 938 A.2d 1226 (mem.) (Court may consider issue not raised below "in the interests of judicial economy"); *Ledbetter v. Brown City Sav. Bank*, 368 N.W.2d 257, 261 (Mich. Ct. App. 1985) (while failure to raise an issue below normally precludes review on appeal, "this rule is not inflexible and will not be applied where the issue is one of law concerning which the necessary facts have been presented") (quotations omitted). This is plainly such a case. First, as our earlier discussion makes clear, the critical factors underlying a forum analysis are largely the same as those applicable to the issue of jurisdiction, to wit, the child's home state, significant connections with the forum, and the location of substantial evidence concerning the child's welfare, care, interests, and personal relationships. See 15 V.S.A. §§ 1032(a), 1036(a). Contrary to the implication of the dissent, therefore, the parties here were afforded ample opportunity to address the critical issues underlying our analysis. Furthermore, as earlier noted, this case has dragged on for too many years, and a remand to address the record evidence under a slightly different legal theory would represent a useless expenditure of time and resources and needlessly subject the child to continued instability.

¶ 29. On more substantive matters, the dissent also claims that, contrary to the Court's conclusion, "[t]he only extraordinary circumstance appearing in this case is mother's criminal contumacy." *Post*, ¶ 35. Here again the dissent has opted for rhetoric over a dispassionate review of the record. As the record makes clear, the child has lived and attended school in Canada for years, has thrived at school and in his community, and would suffer if that stability were threatened. Moreover, evidence and witnesses relating to the child's schooling, home life, and personal relationships are all in Canada. As earlier noted, we are not the first court to recognize that, in weighing the important public interest in finality of judgments against the best interests of a child, the latter must sometimes predominate. Nor, in these highly unique circumstances, will granting Rule 60(b) relief in order to recognize the Canadian judgment unduly expand the rule's scope or undermine its beneficial purposes. The case for relief is compelling and sound.

¶ 30. Finally, the dissent claims that the Canadian court's exercise of jurisdiction was not based on the standards set forth

in the UCCJA. It is true, as the dissent observes, that the Canadian court did not expressly address such UCCJA considerations as the child's home state, whether another state had a closer connection with the child and his family, or the location of substantial evidence concerning the child's care, present and future welfare, and personal relationships. Much of this information was in the record before it, however, and all of these factors undoubtedly informed the Canadian court's explicit conclusion that the retention of jurisdiction was in the best interests of the child, a conclusion with which we fully concur. Thus, the Canadian court's failure to follow the precise forms of Vermont law does not undermine its substantive conclusion that Canada was the more appropriate forum to exercise jurisdiction.

## II.

¶ 31. Our conclusion that the family court should have declined to exercise jurisdiction over the custody issue does not necessarily extend to the contempt motion. See *Thompson v. Thompson*, 171 Vt. 549, 550, 762 A.2d 1236, 1238 (2000) (mem.) (holding that a contempt proceeding is not a custody adjudication under the UCCJA and that the family court acted properly in considering a contempt motion despite its determination that New York offered a more convenient forum); *Matthews v. Riley*, 162 Vt. 401, 414, 649 A.2d 231, 240-41 (1994) (noting that the UCCJA does not affect the court's inherent power to enforce existing custody orders). In this regard, however, we may take judicial notice of the fact that, while the instant appeal was pending, the family court vacated the contempt adjudication in response to mother's disclosure of the whereabouts of the child.[11] Civil contempt is essentially a coercive measure designed to compel compliance with a court order, and as such the contemnor always retains the power to "purge" or terminate the sanction through compliance. *Sheehan v. Ryea*, 171 Vt. 511, 512, 757 A.2d 467, 468 (2000) (mem.). Accordingly, it is well settled that a contemnor who chooses this option renders the contempt order moot and unappealable, for the court is then left with no means to grant effectual relief. See, e.g., *Cent. Emergency Med. Servs., Inc. v.*

[11] We also take judicial notice of the fact that, following mother's release from confinement on the state contempt adjudication, the federal district court sentenced mother on the federal kidnapping conviction to time served on the contempt charge.

*State*, 966 S.W.2d 257, 259 (Ark. 1998) (holding that when appellant, adjudicated in contempt for failure to deliver certain documents, "purged its contempt, it rendered the propriety of the contempt order moot"); *In re Browning*, 573 P.2d 1095, 1095-96 (Kan. Ct. App. 1977) (dismissing appeal of contempt adjudication when mother delivered custody of child in compliance with court order); *Vinson v. Vinson*, 191 S.W.3d 85, 87 (Mo. Ct. App. 2006) (holding that, when wife delivered property to husband in compliance with divorce judgment, she had "complied with the contempt judgment, thus rendering the case moot and unappealable"); see also *In re Young's Tuttle Street ROW*, 2007 VT 118, ¶ 4, 182 Vt. 631, 939 A.2d 521 (mem.) ("[W]hen a tribunal has already granted the relief requested, the appellate case is moot, because the reviewing court can no longer grant effective relief." (Quotation omitted.)). Accordingly, we conclude that the contempt claim has been rendered moot, and need not be addressed on appeal.

*The portion of the family court order denying mother's request for recognition of the Canadian judgment is reversed. The portion of the order denying mother's request for relief from the judgment of contempt is reversed on the ground that the contempt order has been vacated and the issue is moot.*

¶ 32. **Burgess, J.,** dissenting. Mother has never challenged the family court's findings that while suffering from depression she sought to curtail contact with father through an ex parte relief-from-abuse petition denied for lack of evidence, failed to follow up on scheduled treatment for the child's brain lesion and rare seizure disorder, and then, after her abuse allegations against father were fully tried and adjudged meritless, took the child first to Massachusetts and then to other jurisdictions, including Canada, in defiance of a stipulated custody order.[12] These findings and conclusions by the family court are not, despite the majority's

---

[12] The majority's characterization of this history as a "manipulation," *ante*, ¶ 26, is simply puzzling. The unchallenged findings are expressly set forth in the family court's September 13, 2002 order, and are referenced again at length in its February 23, 2006 order. The majority adds, correctly, that mother did obtain a temporary relief-from-abuse order in Massachusetts in 2000 limiting father to supervised visitation, but omits the Vermont family court's finding that when father contested and was in the process of litigating those issues and restrictions, mother "removed herself from the jurisdiction" of Massachusetts. The family court's findings, its chronology of events, and the fact that mother abducted the child, are

alarm, recited to tar mother's character, but to reflect the actual character of the case from the perspective of the family court *based on the evidence and record before it* at the time of mother's motions. On that record, the family court was not called upon to answer the majority's new and relatively simple inquiry as to the most appropriate forum for a custody dispute involving a child living abroad. What confronted the family court was a motion for relief from judgment by mother, who had claimed, but failed to prove, abuse by father, and who was already found to have suffered from depression and "some sort of break-down," "probably in the throes of some mental illness," making her an "unfit guardian for the child," "possibly . . . delusional," potentially placing the child in "danger" and, intent on depriving father of his parental rights, in willful contempt of court by having absconded with the child to parts unknown for years. These undisputed facts, along with mother's then continuing refusal to offer evidence of the child's care and well-being, were considered with other factors in the family court's denial of mother's motions. The case as actually presented to the family court had nothing to do with the majority's theory of forum non conveniens introduced today.

¶ 33. The record having been established, and with mother's Vermont Rule of Civil Procedure 60(b)(6) motion for relief failing to challenge anything but subject matter jurisdiction, which the majority agrees was a doomed effort, the family court had no reason to grant the motion or to entertain other theories not asserted by mother. Mother failed to make any timely objection to the jurisdiction of the family court in 2002, and then later failed to appeal from the 2006 Vermont family court order from which she now seeks to be excused. In the meantime, mother was convicted by a federal jury of felony kidnapping for absconding with the child to Canada. While mother's criminal interference with father's parent-child contact was extraordinary, she demonstrated no extraordinary circumstances warranting relief from the family court's order on jurisdiction under Rule 60(b)(6). There is no basis to disturb the family court's discretionary and rationally explained denial of mother's Rule 60(b) motion. Accordingly, I dissent from the reversal of the family court's order.

¶ 34. The majority bypasses several legal standards to reach its result. The majority reverses the trial court's reasoned decision

not disputed. While these facts may not serve the majority's perception of the case, there is no manipulation of the settled facts as found by the family court.

despite our established abuse-of-discretion standard of review for denial of a Rule 60(b) motion, and the utter absence of any such abuse in the family court's denial of mother's request for relief. The majority also disregards settled law barring relief from judgments from which no appeal has been taken. Instead, the majority purports to consider the merits of mother's jurisdictional claims under Vermont's Uniform Child Custody Jurisdiction Act (UCCJA), 15 V.S.A. §§ 1031-1051, as if presented for direct, de novo appellate review. Rejecting, as a matter of law under 15 V.S.A. § 1032, mother's belated claim that the Vermont family court lacked subject matter jurisdiction, the majority nevertheless proceeds to consider a claim *not* raised and preserved by mother in this appeal: that the family court should have discretionarily declined to exercise its jurisdiction under a different provision, § 1036. Finally, the majority assumes, without an evidentiary record, that the best interests of the child are extraordinary in this case and warrant relief from judgment when mother failed to raise, or refused access to evidence about, such a claim before the family court prior to its entry of final judgment, twice, against her. Given mother's tactical choice not to pursue these arguments in the trial court or on appeal, the family court properly concluded that mother was not entitled to relief under Rule 60(b).

¶ 35. The majority treats these "procedural objections" as overcome in this case because it is one of those rare circumstances where the "finality of judgments must . . . yield to the best interests of the child." *Ante*, ¶ 22. But the facts cited by the majority to support its conclusion are merely that the child lived in Canada for an extended period of time so that information about the child is there. *Ante*, ¶ 21. Of course, this situation would arise whenever one parent kidnaps a child to a foreign jurisdiction and then manages, even by contempt of court, to extend the illegal abduction. Thus, the majority rewards the kidnapper, and encourages others, by equating such unlawful frustration of family court jurisdiction with the best interests of the child. There are no findings, and nothing in the record to suggest, that Canadian information about the child could not be reasonably available to the Vermont family court. The only extraordinary circumstance appearing in this case is mother's criminal contumacy, and this should not be a basis for Rule 60(b)(6) relief from judgment when mother passed, for her own tactical reasons, two opportunities to challenge the previous final judgments.

¶ 36. Having nothing extraordinary to explain its departure from ordinary Rule 60 practice, the majority recites extensively from mother's allegations of abuse, as well as a visitation supervisor's allegations of abuse and a psychologist's report based on those same allegations — all of which, after some six proceedings spread across seven years, two states and the Province of Quebec, remain wholly unproven.[13] Mother failed to carry her burden of proof at the relief-from-abuse hearing. Mother failed to present any evidence at the hearing on father's motion to transfer custody. Mother elected not to offer evidence to the family court that contact with father was contrary to the best interests of the child.

¶ 37. The majority correctly holds that the family court had subject matter jurisdiction under § 1032, and that the family court could decline to exercise its jurisdiction in favor of a more appropriate or convenient foreign forum under § 1036. But the majority is incorrect to entirely recast mother's Rule 60(b) motion as a challenge to the forum as inconvenient or inappropriate, when the actual issue before the family court, and this Court, was narrower: whether mother's belated assertion of subject matter jurisdiction in Canada — to the exclusion of Vermont — could justify relief under Rule 60(b) from a judgment that she failed to challenge through appeal. That decision was discretionary, and the family court's ruling must "stand on review unless the record clearly and affirmatively indicates that such discretion was withheld or otherwise abused." *Bingham v. Tenney*, 154 Vt. 96, 99, 573 A.2d 1185, 1186 (1990) (reiterating that Rule 60(b) determinations are committed to the sound discretion of the trial court).

¶ 38. While the procedural history of this case may be long, it is punctuated by just a few critical events — each the product of mother's tactical choice. Having hidden the child in Canada and secreted herself there, mother was duly served by publication, but failed to appear for the hearing on father's motions to modify and for contempt in August 2002. Her default resulted in the family

---

[13] The psychologist's report, apparently based on information supplied by mother and an interview with the child, simply assumes father battered mother and threatened his child, and recommends against contact with father without some extended preparation. The Quebec court relied on the report in assessing its retention of jurisdiction. It cannot be determined from the record if the author, or mother, was subjected to cross-examination, or if the report was subject to challenge in Quebec. It is clear from the record, however, that mother presented no evidence of abuse nor evidence concerning the best interests of the child to the Vermont family court.

court's September 19, 2002 order, finding mother in contempt based on her willful violation of the earlier custody order, and temporarily transferring child custody to father pending further hearing. Served with the contempt order in October 2002, mother chose not to respond to the Vermont proceedings or otherwise challenge the family court's order for almost two years. Instead, mother commenced proceedings in the Canadian courts, eventually receiving a favorable custody ruling there in May 2003. In the Vermont proceedings, mother did respond to father's motion for medical records in 2004, with her own motion to dismiss for lack of jurisdiction which was dismissed as moot upon the court's denial of father's request. Mother raised no further challenge to the court's jurisdiction or its custody order over the next sixteen months.

¶ 39. Then, in January 2006, upon entering Vermont, mother was arrested and held on the contempt order. In February 2006, mother filed a motion to vacate the 2002 custody order on the grounds that the court lacked jurisdiction. The family court concluded that Vermont did have jurisdiction over the matter and denied the motion, explaining that mother's "failure to offer evidence about this child's present and future needs, and her unilateral detention of this child in violation of this court's order should not operate to confer 'home state' jurisdiction in the place [Canada] where mother has secreted the child." Mother appealed, but her appeal was dismissed in April 2006 for her failure to comply with a scheduling order.

¶ 40. On June 16, 2006, mother filed her motion for relief from judgment under Rule 60(b)(6). Couched as a plea for recognition and enforcement of the Canadian custody order as a matter of international comity and adherence to the UCCJA, mother urged the family court to resolve the "jurisdictional contest between the sovereign state of Canada and the State of Vermont" that had "yet never . . . been addressed by the Vermont courts." Notwithstanding her invitation to respond to a conflict of international proportions, mother's invocation of Canadian jurisdiction as either exclusive or more convenient was, according to our more mundane domestic law, too late and properly denied.

¶ 41. Mother was incorrect in claiming that jurisdiction was not addressed by the family court until her June 2006 motion for relief. Mother raised lack of Vermont jurisdiction four months earlier in her February 2006 motion to vacate the 2002 transfer of

custody to father. Her argument was rejected, and final judgment on that question was entered against her. Mother failed to prosecute her appeal of the issue. We have repeatedly emphasized that Rule 60(b) "is not intended to function as a substitute for a timely appeal." *Donley v. Donley*, 165 Vt. 619, 619, 686 A.2d 943, 945 (1996) (mem.) (quotation omitted). Having failed to appeal the family court's denial of her jurisdictional complaint, and citing nothing extraordinary to excuse that failure, mother was foreclosed from seeking consideration of that matter through Rule 60(b).[14]

¶ 42. The majority claims that mother's Rule 60(b) motion afforded the family court an "opportunity" to consider the discrete question of whether jurisdiction would be most appropriately exercised by Canada rather than Vermont. *Ante*, ¶ 22. Mother, however, already had multiple opportunities to litigate this claim and failed to raise it. The issue of inconvenient forum under the UCCJA, 15 V.S.A. § 1036, on the same facts, was available to mother when she defaulted on the motion to modify in 2002. The issue was equally available to mother when she moved to vacate the 2002 custody order in February 2006. Examination of mother's pleading and memoranda reveals no such claim. Where a party has an opportunity to contest jurisdiction and fails to do so, "Rule 60(b)(6), which normally affords relief only under extraordinary circumstances, is unavailing . . . with respect to [the] jurisdictional claims." *Donley*, 165 Vt. at 620, 686 A.2d at 945. This is because "simple failure" to raise jurisdictional issues "is not an 'extraordinary circumstance' justifying relief from judgment under Rule 60(b)(6)." *Town of Washington v. Emmons*, 2007 VT 22, ¶ 7, 181 Vt. 586, 925 A.2d 1002 (mem.). Even if the standards for exercising jurisdiction in § 1036 of the UCCJA were somehow invoked by mother's argument, or by the family court's decision,

---

[14] The majority intones, without evidence, that this is "one of those rare instances justifying relief" and "does not represent an abandonment of the rule." *Ante*, ¶ 27. As acknowledged by the majority, the power to reform a judgment under Rule 60 in special circumstances must be exercised "guardedly." *Levinsky v. State*, 146 Vt. 316, 318, 503 A.2d 534, 536 (1985). Mother's situation is no different from the Rule 60 claim rejected in *Levinsky*, wherein this Court explained that such extraordinary powers are not for situations where a litigant "realizes he made an error in judgment," and there is no showing "that mistake, accident, or fraud prevented appellant from presenting a meritorious defense in the original proceeding." *Id.* at 319, 503 A.2d at 537.

the ruling was not appealed and so could not be raised anew under Rule 60(b). See *Donley*, 165 Vt. at 619, 686 A.2d at 945.

¶ 43. Moreover, having failed to raise the issue of inappropriate forum below, mother failed to preserve that question for appeal. The issue was not raised, nor was there any mention of § 1036 or its grounds for family court deference to a more appropriate jurisdiction, in her Rule 60(b) motion or in her appeal here. Rather, in her Rule 60(b) motion and on appeal, mother argued lack of subject matter jurisdiction — an argument the majority rightly rejects here because the family court's subject matter jurisdiction was evident on the record. *Ante*, ¶ 17. To reach the question of appropriate forum, the majority disregards established limitations on appeal: (1) that claims not raised below will not be reviewed for the first time on appeal, *Greene v. Bell*, 171 Vt. 280, 287 n.3, 762 A.2d 865, 871 n.3 (2000); and (2) that matters not briefed will not be considered on appeal. *State v. Settle*, 141 Vt. 58, 61, 442 A.2d 1314, 1315 (1982). "It is our long standing rule that this court should not put the lower court in error when the latter was not afforded the opportunity of considering and acting upon the issue itself." *Laird Props. New England Land Syndicate v. Mad River Corp.*, 131 Vt. 268, 282, 305 A.2d 562, 570 (1973). Instead, the majority reconstructs mother's failed appeal to present a different "critical question" of the "more appropriate forum" and then reverses the family court, not for an abuse of discretion, but for not correctly answering a question that mother never asked. *Ante*, ¶ 12 (quotation omitted).

¶ 44. Mother asserted no issue actionable under Rule 60(b)(6). The family court's ruling on jurisdiction was not appealed, so the jurisdictional issues may not be raised now through a motion for relief from judgment. See *Kellner v. Kellner*, 2004 VT 1, ¶ 12, 176 Vt. 571, 844 A.2d 743 (mem.) ("Rule 60(b)(6) may not substitute for a timely appeal . . . .") (quotation omitted). Furthermore, despite opportunities to do so, mother never raised the issue of Vermont as an inappropriate forum, so the failure to present that question to the family court was not an extraordinary circumstance subject to review under Rule 60(b)(6). See *McCleery v. Wally's World, Inc.*, 2007 VT 140, ¶ 13, 183 Vt. 549, 945 A.2d 841 (mem.) (holding that issues that could have been raised at trial or on direct appeal may not be asserted for the first time in a Rule 60(b) motion). Even if mother's repeated claims of no subject matter jurisdiction under § 1032 are treated as challenging the

appropriateness of the forum under the standards of § 1036, mother sought no appeal from the family court's ruling. Thus, if the family court failed to address the § 1032 claims as a § 1036 challenge, Rule 60(b) remained unavailable to mother as a means for collateral attack on the judgment in lieu of appeal. *McCleery*, 2007 VT 140, ¶ 13.

¶ 45. Rule 60(b)(6), a catch-all provision, offers relief from judgment for "any other reason justifying relief from the operation of the judgment" not already available under the rule's several more specific grounds for relief. See V.R.C.P. 60(b)(1)-(5).[15] Rule 60(b)(6) relief requires "extraordinary circumstances." *Donley*, 165 Vt. at 620, 686 A.2d at 945. Extraordinary circumstances do not include, as the family court recognized, the "free, calculated, and deliberate choice" of mother to not appeal either the 2002 or the 2006 order.[16] See *Estate of Emilo v. St. Pierre*, 146 Vt. 421, 424, 505 A.2d 664, 666 (1985) (ruling that "clause (6) of [Rule 60(b)] may not be used to relieve a party from free, calculated, and deliberate choices he has made"). Nor is there anything extraordinary about mother's tactical choice to litigate subject matter jurisdiction under § 1032, rather than argue that Vermont was an inappropriate forum under § 1036. That mother failed to appear at the custody hearing in 2002, or might have pursued other tactics or arguments afterwards, is similarly unremarkable. See *Kellner*, 2004 VT 1, ¶¶ 12-13 (denying Rule 60(b)(6) relief from a tactical decision that, in retrospect, was ill-advised). The family court's denial of mother's motion on these grounds was entirely correct.

¶ 46. The majority does not, and cannot, point to any abuse of discretion in the family court's denial of Rule 60(b)(6) relief. Vermont's UCCJA mandates that the family court recognize an out-of-state custody decree when the foreign court "assume[s] jurisdiction under statutory provisions substantially in accordance with this chapter or which was made under factual circumstances

---

[15] These include opportunity for relief on account of "(1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence . . . ; (3) fraud . . . ; (4) the judgment is void; [and] (5) the judgment has been satisfied . . . or it is no longer equitable," provided that "[t]he motion shall be filed within a reasonable time, and for reasons (1), (2), and (3) not more than one year after the judgment." V.R.C.P. 60(b).

[16] The family court's ruling refers only to mother's failure to appeal the 2002 order, but mother also failed to perfect and prosecute her appeal of the 2006 order.

meeting the jurisdictional standards of the chapter." 15 V.S.A. § 1041. Mother made no such showing here. The family court explained that it would not defer to the Canadian order because mother failed to demonstrate that Canadian jurisdiction was exercised compatibly to Vermont's statutory standard. That standard directs the court to determine "if it is an inconvenient forum" by considering "if it is in the interest of the child that another state assume jurisdiction," and gives the court discretion to weigh several factors including residence, family connections and availability of evidence in the other state. 15 V.S.A. § 1036(c).

¶ 47. In contrast, the Canadian exercise of jurisdiction was premised on the merits of the custody petition, different substantive law, and on payment of child support. The Quebec court recited that it considered the best interests of the child, not in the context of convenience to the child and geographic availability of relevant evidence as in the UCCJA, but from its conclusion based on an expert's report that contact with the father was inadvisable. The Quebec order also explained, essentially, that its doctrine of forum non conveniens presumed that jurisdiction would not be declined in favor of another forum, and that to do so would require an "exceptional exercise" of its power. The Canadian court declared, without description or analysis, that the "judge ha[d] studied the pertinent facts and . . . concluded that no other jurisdiction was manifestly more appropriate than Quebec." Reciting that the child's best interests guided its tribunal, the Quebec order emphasized that best interests *"consists in receiving as soon as possible the child support to which he is entitled."* These differences are not, as posited by the majority, mere matters of form over substance, but are different substantive standards quite apart from Vermont's UCCJA.

¶ 48. The Quebec order, on its face, affirmed the exercise of Canadian jurisdiction on grounds substantially different from Vermont's UCCJA jurisdictional provisions. The record confirms that the Quebec court's conclusion — that no other forum appeared more appropriate than itself — was not based on standards or facts warranting the exercise of jurisdiction under the UCCJA. Thus, it was not error for the family court to declare that it could not find that Canada exercised its jurisdiction according to considerations substantially similar to the UCCJA standards. The family court was correct in pointing out that the Canadian court considered none of the other factors set forth in

§ 1036(c). Unable to satisfy the statutory precondition to recognition of the foreign order, mother was not entitled to its enforcement. 15 V.S.A. § 1041. It was no abuse of discretion for the family court to follow the dictates of the statute and deny mother's motion.

¶ 49. Even if we turn back the clock and pose this as an appeal from a family court decision that Vermont was not an inconvenient forum, the record below still supports such a ruling as wholly within the family court's discretion under § 1036. The court did consider the best interests of the child and concluded that mother absconded with him to frustrate father's parental rights, that her alienation of the child was unjustified and the product of reasons "known only" to her and not supported by the evidence. Those facts did not recommend that it was "in the interest of the child that another state assume jurisdiction." 15 V.S.A. § 1036(c). The family court's findings support its exercise of jurisdiction because, wherever the child was located, it was only in furtherance of mother's kidnapping and alienation of the child from his father. Mother's refusal to respond to process precluded findings by the court about the child's "home state," his connections to another state or the availability of evidence. *Id.* § 1036(c)(1)-(3). These findings are not challenged.

¶ 50. Had it appeared that mother settled the child in another forum, the family court's exercise of its jurisdiction still did not "contravene any of the purposes of this chapter." *Id.* § 1036(c)(5). Indeed, the family court's insistence on exercising its jurisdiction served the express purpose of the UCCJA to "discourage continuing controversies over child custody in the interest of greater stability of home environment and of secure family relationships for the child," and to "deter abductions and other unilateral removals of children undertaken to obtain custody awards." 1979, No. 136 (Adj. Sess.), § 1(4)-(5). Even if, from the viewpoint of the majority, mother was not "consciously forum-shopping in moving to Canada," *ante*, ¶ 20, there is no reasonable doubt that she was consciously kidnapping the child in obvious derogation of an existing parent-child contact order and Vermont's UCCJA.

¶ 51. The 2002 findings were essentially reiterated in the family court's February 23, 2006 order denying mother's belated motion to dismiss for lack of subject matter jurisdiction. Those findings remain unchallenged. Even imagining that the family court decided forum non conveniens under § 1036, mother's introduction of

the Canadian court's opinion — that Vermont's forum was no more appropriate than Quebec's based on the child's residence and connections in Quebec — did not trump Vermont's statutory and family court interest in refusing to accept parental abduction and alienation as being in the child's best interests. Another court more tolerant of parental kidnapping might have balanced the § 1036 factors differently, but a "difference in judicial opinion is not synonymous with abuse of judicial discretion." *Dyer v. Lalor*, 94 Vt. 103, 116, 109 A. 30, 36 (1920) (quotations omitted). Deferral by the family court to Quebec as the child's "home state" under the unfortunate circumstances of this case would lend judicial imprimatur to mother's illegal detention of the child — exactly what the UCCJA was intended to discourage, if not eliminate. The family court did not abuse its discretion in deciding not to defer to Quebec when, instead, its own exercise of jurisdiction was expressly authorized by § 1036.

¶ 52. Accordingly, I would affirm the family court order. I am authorized to state that Judge Teachout joins in this dissent.