VERMONT SUPREME COURT
109 State Street
Montpelier VT 05609-0801
802-828-4774
www.vermontjudiciary.org

Case No.      22-AP-101



*Note: In the case title, an asterisk (\*) indicates an appellant and a double asterisk (\*\*) indicates a cross-appellant.  Decisions of a three-justice panel are not to be considered as precedent before any tribunal.*

## ENTRY ORDER

SEPTEMBER TERM,   2022

In re C.H. & A.H., Juveniles  } APPEALED FROM:
(J.H., Father\*)      }
          } Superior Court, Windham Unit,
          } Family Division
          } CASE NOS. 20-JV-00114 & 20-JV-00115
           Trial Judge: Michael R. Kainen

In the above-entitled cause, the Clerk will enter:

Father appeals the order of the family division finding C.H. and A.H. to be children in need of care or supervision (CHINS).  We affirm.

Father and mother were previously married and have two children: son A.H., who was born in December 2013, and daughter C.H., who was born in June 2016.  In August 2020, the State filed a petition alleging C.H. and A.H. were CHINS based on concerns that C.H., who was then four years old, had been sexually assaulted.  The court issued emergency and temporary care orders transferring custody of the children to the Department for Children and Families (DCF) and the children were placed with a foster family.  After a merits hearing, which took place over three days in March and May 2021, the court issued its decision in August 2021.

The family division found the following facts in its merits decision.  Parents separated in November 2016, and their separation was acrimonious.  Father and paternal grandmother repeatedly accused mother of abusing or neglecting the children.  In 2017, grandmother told the children's pediatrician that mother was mentally ill and neglected the children by leaving them in dirty diapers.  In 2018, grandmother reported to DCF that mother was taping the children to chairs.  DCF met with mother and interviewed the children but did not find a basis for further investigation.  In 2019, grandmother reported to DCF that mother was living in a "crack house" after hearing a rumor that another resident in mother's apartment building used drugs.  In March 2020, father reported that mother was locking the children in the barn, "strapping" them, and locking A.H. in his room.  A DCF investigator visited the home and spoke with A.H.  A.H. said that mother did punish him by locking him in his room but denied any other abuse.  The investigator determined that there was a hook-and-eye latch on the inside of A.H.'s door and that the barn door was not lockable.  She closed the case.  When she informed father that the allegations were unfounded, he became very upset and said the children were not safe with mother.

Mother made two reports to DCF about father. In the first, she alleged that father was under the influence of drugs when the children were in his care. In the second, she alleged that father was under the influence of alcohol when he brought the children to a custody exchange. No investigations were opened as a result of these reports.

In 2018, father brought A.H. to his pediatrician to treat bruises on the top of his foot. The pediatrician observed abrasions and a vertical bruise on the right side of A.H.'s face. A.H. said the bruise came from running into a laundry counter; however, the bruising appeared to the doctor as though someone had grabbed A.H.'s face and squeezed it. A.H. also had a bruise on his buttocks that he said came from falling on a Nerf gun. The doctor did not believe this explanation and made a report to DCF. The court found it unlikely that any of the Nerf guns in A.H.'s collection had caused the latter injury.

C.H. had a history of diaper rashes and vaginal adhesions. She was prescribed Premarin cream in 2018. C.H.'s nurse practitioner testified that vaginal irritations in toddlers can be naturally occurring and do not necessarily indicate abuse. Around the time that the COVID-19 pandemic began, mother observed that C.H. would become visibly distraught and state that she had to urinate, but then would not urinate. Mother shared her concern with father. She also observed that C.H. had some vaginal irritation around this time, which she attributed to a yeast infection.

In August 2020, mother remarried. Both children attended the wedding, which took place over the weekend of August 1 to 2. Various witnesses who attended the wedding stated that they did not see anything unusual and that everyone was keeping an eye on the children. On August 3, mother's husband brought the children to paternal grandmother, who cared for the children while father was at work. C.H. told grandmother that her vagina was bleeding. She showed the area to grandmother. Grandmother observed that it looked chafed and put some Desitin on it. She asked C.H. if anyone had touched her and C.H. said "Mama." She denied that anyone else had touched her. Grandmother reported this incident to father. She did not believe it was an emergency because C.H. had vaginal lesions before.

The next day, father took C.H. to her primary care provider's office. Father told a nurse practitioner that C.H. had reported that mother held her down and cut her vagina with scissors. The nurse practitioner observed swelling on the vagina and multiple scratches on C.H.'s abdomen and legs, which C.H. said were from bees. The nurse practitioner referred C.H. for a sexual-assault exam at the hospital. The sexual assault nurse examiner reported that C.H. wanted to hug and kiss her, even though she was a stranger, and offered to show her "pee pee" to both the nurse and the doctor without prompting. The nurse examiner observed bruising, abrasions, and an injury to the vagina, which caused her to suspect abuse. A swab of C.H.'s vaginal area tested positive for gonorrhea, a sexually transmitted disease.

Approximately two weeks later, C.H. was examined by a doctor who found that the vaginal injuries had healed. The gonorrhea had cleared as a result of the antibiotics C.H. was prescribed. The doctor testified that the incubation period for gonorrhea is one to two days, but it can be asymptomatic for some time. Based on her testimony, the court found that there was no way to determine medically when C.H. was exposed to the gonorrhea.

The court found by clear and convincing evidence that C.H. was sexually abused and that the gonorrhea was the result of sexual contact. However, the evidence was insufficient for the court to determine who perpetrated the abuse. The court found that both children had exhibited sexualized behaviors and had presented with physical injuries for which they had given

2

medically implausible explanations. It found that A.H. was likely physically abused while he was in parents' care. The court found that, although it could not determine which parent was to blame for the abuse, the children would be at risk of harm if the petition were dismissed. It accordingly found the children to be CHINS.

DCF transitioned the children back to parents' care in August 2021. In March 2022, the court issued a disposition order placing the children in mother's care with conditions and granting father parent-child contact. In its order, the court found that at the time the CHINS petition was filed, the children were primarily being cared for by father and paternal grandmother. When the children entered custody, they expressed fear of mother, but these negative statements were inconsistent with their behavior when they saw mother during visits and were likely coached and encouraged by father and paternal grandmother. The court found there was a significant risk that this alienation would continue if father had primary custody of the children. The court found that both children exhibited highly sexualized conduct, potty-talk, tantrums, and a lack of physical boundaries when they entered foster care. The foster parents instituted strict rules prohibiting the children from being alone together, forbidding potty talk, and setting clear routines for the children. As a result, the children's behaviors had greatly diminished, and had not returned since the children reentered parents' care. Both parents had engaged in Family Time Coaching and had been receptive to suggestions from providers. However, the court found that mother's parenting style was more effective in supporting the children and minimizing concerning behaviors. Accordingly, it awarded primary custody to mother. Father appealed.

The State alleged that C.H. and A.H. were CHINS because they were "without proper parental care or subsistence, education, medical, or other care necessary for [their] well-being." 33 V.S.A. § 5102(3)(B). The State had the burden of establishing these allegations by a preponderance of the evidence. 33 V.S.A. § 5315(a). "When reviewing a CHINS decision, we uphold the court's factual findings unless clearly erroneous and the court's legal conclusions when supported by those findings." In re D.D., 2013 VT 79, ¶ 34, 194 Vt. 508.

As a threshold matter, we address mother's argument that this appeal is moot because the conditional custody order has expired and the family division issued a parental rights and responsibilities order in the companion post-judgment divorce case awarding mother sole legal and physical parental rights and responsibilities, which father has not appealed.[*] "A case or a claim becomes moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." State v. J.S., 174 Vt. 619, 620 (2002) (mem.). We disagree that father's appeal from the CHINS merits adjudication is moot. Father is challenging the merits determination itself, not the associated disposition order. Father attempted to appeal immediately from the CHINS merits adjudication, but we dismissed the appeal as premature because no disposition order had yet issued. Father is not to blame for the fact that it took the

---

[*] Father moved to strike mother's mootness argument and her supplemental printed case because the family division's order is not part of the record in this appeal. Although the records of the parentage proceeding are not part of the record in this case, this Court may take judicial notice of adjudicative facts, such as court orders, and is required to do so when requested by a party and supplied with the necessary information. See Miller v. Miller, 2008 VT 86, ¶ 31, 184 Vt. 464 (taking judicial notice of family court order issued during pendency of appeal and of fact that party was sentenced by federal district court); V.R.E. 201(d) (stating court shall take judicial notice of adjudicative facts if requested by party and supplied with necessary information). Father's motion is therefore denied.

3

family division a year to adjudicate the merits and over seven months to issue a disposition order from which he could appeal. More importantly, the facts found by the court in its CHINS adjudication were in part the basis for the transfer of custody to mother and could become relevant again if either party seeks to modify custody in future. See 33 V.S.A. § 5117(c)(1) (permitting disclosure of records from juvenile proceeding in related child custody case). Thus, even if the order in the divorce case resolved the issue of the children's current placement, the CHINS adjudication could have negative collateral consequences for one or both parents in the future. State v. J.S., 174 Vt. at 620 (explaining that there is exception to mootness doctrine when negative collateral consequences likely to result from decision); see also In re B.C., 2018 VT 126, ¶ 11 n.4, 209 Vt. 48 (noting that this Court denied juvenile's motion to dismiss mother's appeal of CHINS determination as moot even though family court had subsequently returned custody to mother without conditions). Accordingly, we will address father's claims on their merits.

Father argues that the CHINS merits adjudication must be reversed because the court did not find that either parent was directly responsible for the sexual abuse and there was no evidence that C.H. was at risk of further abuse if she were returned to parents' care. He notes that the court did not find that the children were without proper medical care and contends that such a finding would not be supported because the record shows that parents sought medical care when the children presented with illness, injury, or troubling behavior.

We see no error in the court's finding that the children were CHINS. "The focus of a CHINS proceeding is the welfare of the child." In re B.R., 2014 VT 37, ¶ 13, 196 Vt. 304 (quotation omitted). "The principal issue is whether, given all of the circumstances, the child is without proper parental care, such that the child's well-being is threatened," which is a question of fact unique to each case. In re J.C., 2016 VT 9, ¶ 7, 201 Vt. 192 (quotation omitted). For this reason, the State is not required to show, and the court does not have to find, that a parent has actually harmed a child in order to support a CHINS determination. See E.J.R. v. Young, 162 Vt. 219, 222 (1994) ("A CHINS action, however, does not depend on allegations of willful acts by a parent."). Rather, it is sufficient to show that the child is at risk of harm. In re J.C., 2016 VT 9, ¶ 7.

It is undisputed that four-year-old C.H. contracted gonorrhea while in the care of her parents, who were sharing custody at the time. The court further found that both children displayed inappropriately sexualized behaviors and that A.H. had likely been physically abused while in parents' care. These facts are supported by the record and were more than sufficient to support the court's determinations that the children were without proper parental care and were at risk of further harm at the time the petition was filed. Contrary to father's assertion, it is not fatal to the CHINS merits decision that the court was unable to determine in which parent's care the children were when the sexual and physical abuse took place. See In re C.P., 2012 VT 100, ¶ 28, 193 Vt. 29 (noting that "abuse, neglect and dependency proceedings are focused on [the] juvenile and do not require a finding related to each parent's conduct"). The court properly focused on the welfare of the children and determined that state intervention was necessary to protect them from an environment where they were being harmed. Its findings are supported by the evidence, and we therefore affirm its decision.

Father also argues that the family division lacked jurisdiction to enter a disposition order because the court erroneously adjudicated the children to be CHINS. Because we conclude that the CHINS merits adjudication is supported by the record, this argument necessarily fails. See

4

33 V.S.A. §§ 5315, 5316, 5317, 5318 (providing that if court finds child to be CHINS, it shall order DCF to prepare disposition case plan, hold hearing, and issue disposition order).

Affirmed.

BY THE COURT:

---

Harold E. Eaton, Jr., Associate Justice

---

William D. Cohen, Associate Justice

---

Nancy J. Waples, Associate Justice